UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

QWEST COMMUNICATIONS
INTERNATIONAL, INC.,

   Plaintiff,

     v.

CONQWEST, INC.,

   Defendant.

Civil Action No. 04-cv-11878 RCL

**OPPOSITION TO DEFENDANT'S MOTION TO FILE AN AMENDED ANSWER AND COUNTERCLAIMS**

Plaintiff Qwest Communications International, Inc. ("Qwest") hereby opposes defendant ConQwest, Inc.'s ("ConQwest's") Motion to File an Amended Answer and Counterclaims. ConQwest seeks to amend its answer to assert a counterclaim ten months after the deadline for motions to amend the pleadings, at least three months after it admits it had notice of the counterclaims, and less than a month before the close of discovery. Because ConQwest has presented no good cause for its motion, and because Qwest would be prejudiced by being entirely precluded from conducting discovery on ConQwest's late claims, this Court should deny ConQwest's motion to amend.

Qwest is a telecommunications company that has provided variety of communications services, including data services such as private networks, since at least 1997. Qwest has registered the mark "QWEST" for use in connection with "telecommunications services, namely, the electronic transmission of voice, data and messages."[1] This mark was registered on April 9, 1996. Qwest has other federally registered and common law trademarks for related goods and

---

[1] U.S. Trademark Registration No. 1,966,694 (ex. A).

services, such as the variant "REQWEST," for "telecommunications services, namely, . . . electronic transmission of voice, video messages, and data [and] providing multi-user access to a global computer information network."[2] Qwest uses the QWEST mark, variants, and phrases including the coined term QWEST for a wide variety of goods and services that comprise or are related to voice, data, and messaging, including internet security services, like firewall, intrusion detection, and virtual private networks.

Defendant ConQwest was incorporated on March 22, 1999. ConQwest offers communications internet network security services and software (as a reseller of software made by other companies).

Qwest alleges, among other things, a likelihood of confusion between ConQwest's provision of internet network security services with the mark CONQWEST and Qwest's provision of internet network and network security services with the mark QWEST, in violation of the Lanham (Trademark) Act of 1946, as amended, 15 U.S.C. § 1051 *et seq*.

Qwest brought its complaint in this Court on August 27, 2004. (*See* Docket No. 1.) ConQwest timely filed its answer on September 27, 2004 with no counterclaims. (*See* Docket No. 4.)

On October 17, 2005, ConQwest's counsel emailed Qwest's former counsel, complaining about Qwest's use of the term "conqwest" in connection with a promotional campaign consisting of a scavenger- or treasure- type hunt in several cities in the western United States, including Denver.[3] (*See* Ex. D.)

---

[2]   U.S. Trademark Registration No. 2,659,826 (ex. B).
[3]   Qwest notes that this case was originally filed by in the United States District Court for the District of Colorado. Defendant ConQwest opposed venue in that court on the grounds that defendant ConQwest did not transact any business in Colorado.

On November 11, 2005, the parties jointly moved to amend certain aspects of the Scheduling Order. (*See* Docket No. 23.) ConQwest did not request that the deadline to file amended pleadings be extended in that motion, nor did ConQwest raise the issue with counsel for Qwest.

On January 23, 2006, the parties again jointly moved to amend the scheduling order by extending fact discovery by one month. Again, ConQwest did not request that the Court relieve ConQwest from the deadline to amend the pleadings.

One day later, on January 24, 2006, after the deadline to file amended pleadings had passed, three months after ConQwest's first complaint to Qwest about the use of the word Conqwest in Qwest's promotional campaign, and following two previous amendments of the scheduling order, ConQwest moved for leave to file an amended answer that included a counterclaim for trademark infringement and dilution of ConQwest's trademark rights in the mark CONQWEST by Qwest's use of the term "Conqwest" in its promotional campaign.[4]

Under Fed. R. Civ. P. 16(b), a court may permit a party to amend its pleadings outside of the time imposed by the court's scheduling order only upon a showing of good cause. *See O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154 (1st Cir. 2004) (upholding a court's denial of a motion to amend filed five months late); *see also Riofrio Anda v. Ralston Purina Co.*, 959 F.2d 1149, 1154 (1st Cir. 1992) (noting that "Plaintiffs, in blatant disregard of the [scheduling order] deadline, submitted a motion to amend their complaint to include the contract damages claim *two months* after the deadline had expired," (emphasis in original) and upholding

---

[4] By e-mail to counsel for ConQwest, Qwest noted that certain affirmative defenses, e.g., comparative negligence, Statute of Frauds, and breach of the covenant of good faith and fair dealing, had no discernable basis in fact or the claims at issue, asked that ConQwest delete from the proposed Amended Answer and Counterclaim, and pointed out Qwest would not

the district court's denial of the motion to amend); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 069-10 (9th Cir. 1992) (upholding a denial of a motion to amend filed four months late). The moving party's indifference, or unexplained failure to seek to amend the pleadings within the time provided by the court's scheduling order, forecloses that party's right to relief. *O'Connell,* 357 F.3d at 155.

The "'good cause' standard emphasizes the diligence of the party seeking the amendment." *O'Connell,* 357 F.3d at 155. In particular, a scheduling order may be modified only "if it cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16, 1983 advisory committee's notes; *see also O'Connell*, 357 F.3d at 154.

This Court ordered that any amended pleadings must be filed by March 1, 2005. (*See* Clerk's Notes dated December 1, 2004.)[5] Even if ConQwest only learned of Qwest's actions in October of 2005, given that the deadline for filing motions to amend had already passed, its three-month delay in filing its motion is inexcusable. ConQwest was duty-bound, in any further communications with the Court on the subject of the schedule for the case, to raise the issue if they intended to pursue it.

After March 2005, the parties repeatedly stipulated to three amendments of the scheduling order, which the Court allowed (*see* Orders dated June 30, 2005, January 5, 2006, and January 24, 2006). Although the emails of ConQwest's counsel demonstrate awareness of the potential claim no later than October 2005, ConQwest never requested, and the Court never

---

oppose to that extent. (*See* Ex. E.) ConQwest has maintained those defenses in its proposed amended answer. (*See* ConQwest's Proposed Amended Answer (Docket No. 34) at 10-11.)

[5] On March 1, 2005 (the deadline for filing amended pleadings), Qwest moved for leave to amend Count IV (a claim asking the Court to rectify the trademark register based on the outcome of the suit under 15 U.S. Section 1119 to note that the required rectification would be "cancellation" of defendant's trademark as opposed to "refusal of registration." Qwest's motion to amend was denied. (Margin order dated April 14, 2005.)

allowed, an extension of time to file amended pleadings in the two further motions to amend the Scheduling Order that were filed. ConQwest's emails demonstrate that it was aware of them at least as early as October, 2005. (*See* Ex. D.) Yet in neither of the parties' two subsequent motions to amend the scheduling order did ConQwest seek to extend the deadline for filing amended pleadings.

ConQwest's proposed excuse for its dilatory behavior rests in its assertion that it would have been counterproductive to ongoing settlement discussions to file the motion to amend earlier. (*See* ConQwest's Motion to Amend (Docket No. 34) at 2.) But it is illogical to suggest that it would hardly have been counterproductive to settlement discussions for ConQwest to have given plaintiff notice that it had a potential counterclaim that it would seek to assert these claims if the case did not settle. Indeed, this is precisely the leverage ConQwest was attempting to gain by sending the e-mails that are attached as Ex. D. What is inexcusable is that ConQwest did not at least seek to extend the deadline for filing a motion to amend into either of the two motions to amend the scheduling order that the parties were filing. (Docket Nos. 23 and 32.)

The second of these motions was filed after the parties had agreed that the case could *not* be settled in the near term. That is, the motion to amend the scheduling order was amended most recently based on the clear agreement of counsel that the case was going forward on the merits. Yet ConQwest did not raise or address the possibility of an entirely new claim in the case in the joint motion until the day after the motion was filed. The timing of the motion strongly suggests that ConQwest knew it was going to make such a motion but refrained from saying anything about it.

This case has been pending since August 27, 2004. The deadline for fact discovery has been extended three times. This is not the time for either party to be expanding its case.[6] "The purpose of limiting the period for amending the pleadings is to assure 'that at some point both the parties and the pleadings will be fixed.'" *O'Connell*, 357 F.3d at 154 (quoting Advisory Committee Notes to the 1983 Amendments to Fed.R.Civ.P. 16(b)). With less than a month remaining for fact discovery, Qwest submits that the point at which both the parties and the pleadings should have been fixed passed long ago.

In addition, Qwest would be substantially prejudiced by ConQwest's late counterclaims.[7] ConQwest's proposed counterclaims raise several new issues, for example: whether Qwest's actions in establishing a web site for an urban scavenger game is likely to "cause confusion, deception, or mistake" with respect to ConQwest's trademark in the field of internet security (*see* ConQwest's Proposed Amended Answer and Counterclaims at 14, ¶¶ 20 & 21); whether "Qwest's acts have been committed willfully and with intent" (*see id.* at 15, ¶ 22); whether "CONQWEST has suffered and continues to suffer irreparable injury" (*see id.,* ¶ 23); "CONQWEST's trademark is distinct and famous" (*see id*. at 17, ¶ 29); and "[w]ithout injunctive relief, CONQWEST has no means by which to control the [alleged] continuing injury to its reputation and goodwill or of the [alleged] continuing dilution of its trademark" (*see id*. at 17, ¶ 33). Yet, were the Court to allow the new counterclaims, Qwest would be literally precluded

---

[6]  In its recent Responses and Objections to Defendant's First Requests for Production of Documents served by hand on January 30. 2005, Qwest noted that it has ***narrowed*** its case, stating that it does not intend to rely on its claims for trademark dilution under either state or federal law and that it does not seek damages as a remedy. (*See* Docket No. 38, ex. F at 2, ¶ 6.)

[7]  In a motion to amend filed outside the time limits imposed by the court's scheduling order, prejudice to the opposing party is a relevant consideration. *O'Connell*, 357 F.3d at 155.

from the benefit of any written discovery of the affirmative claims being asserted against it for the first time.

Fact discovery closes on February 28 (*see* Margin Order dated January 24, 2006), after having been extended by the Court already three times. Thus, any discovery Qwest served at this time would be ineffective, since it would be due after the close of fact discovery. Qwest would not be able to serve either document requests or interrogatories. Written fact discovery is particularly important for Qwest in the role of *defendant*, since such discovery provides the primary mechanism by which Qwest may discern ConQwest's legal theories and proof. Qwest cannot defend a case where it is not able to determine with specificity the allegations against it. *See Conley v. Gibson*, 355 U.S. 41, 47-48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) ("[S]implified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.").

The extent to which ConQwest seeks to expand this case is shown by an overview of the relevant dispute thus far.

This case is essentially a battle between Qwest and ConQwest regarding which company used their mark first for the relevant goods and services, and the scope of the relevant goods and services is exactly the aspect of the case that ConQwest now seeks to expand with it amendment.

The marks themselves are nearly identical. Qwest's word mark QWEST is coined and distinctive because it begins with the letter "Q," one of the rarest letters in English spelling and it intentionally violates the invariable rule of English spelling that the letter "Q" is followed by the letter "u." ConQwest has adopted the same root mark, but merely attached the prefix "Con-," meaning "with." Thus, the connotative meaning of ConQwest's mark is "With Qwest."

ConQwest consistently presents it mark on its website and in its promotional literature with the intermediate letter "Q" capitalized, which further draws the eye to and emphasizes the "QWEST" portion of the mark.

Because plaintiff Qwest coined the mark "QWEST," it was the first to use it as a trademark in the United States. Qwest has federal trademark registrations for telecommunications services, i.e., the transmission of voice, data, and messages, going back to the late 1980s, more than a decade before ConQwest was even incorporated.

One type of data transmission service is internet service, and Qwest has provided a variety of network and internet transmission services in connection with the mark QWEST since before ConQwest's incorporation in March 1999. For example, plaintiff Qwest obtained US Trademark Registration No. 2,327,087 for "QWEST. RIDE THE LIGHT" for, among other things, "IP [Internet Protocol] telephony," "providing access to a global computer information network," and "dedicated and virtual network services." Plaintiff Qwest used the mark QWEST. RIDE THE LIGHT in connection witht all the goods and services described in the registration at least as early as October 16, 1997, more than a year and one-half before ConQwest was even incorporated, and continued to use the exact phrase through into 2002.[8]

---

[8] U.S. Trademark Registration No. 2,327,087 (ex. C), alleging a date of first use in commerce for each of the services described of October 16, 1997. Under the Lanham Act, Section 33(a), 15. U.S.C. § 1115(a), the registration of a trademark on the Principal Register "shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods and services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect ["  as set forth in 15 U.S.C. § 1115(b). ConQwest was incorporated in March 1999 and has alleged April 1999 as its earliest date of use of the mark CONQWEST for any goods or services.

ConQwest offers network internet security services and software,[9] services that are closely related to the network services for which Qwest has prior rights. (*See* Ex. A & Ex. B; *see also* Ex. F, Plaintiff Qwest's Response to ConQwest Interrogatory No. 3 served February 3, 2006.)

Thus, the dispute centers on the highly factual inquiry into Qwest's allegations of prior trademark uses for the specific goods and services, and whether ConQwest offers services that are the same as or closely related to Qwest's services so that ConQwest's activities are infringing Qwest's trademark rights. The outstanding discovery requests and responses to date naturally read specifically in terms of those goods and services.

It is exactly this aspect of the dispute that ConQwest seeks to expand by its late motion to amend. In 2004 and 2005, Qwest offered a promotional urban scavenger hunt-type game advertised on and operated via the internet and hosted in localities in the western United States. ConQwest seeks to allege, with less than a month remaining in the fact discovery period, that Qwest's use of the terms "Conqwest2004" and "Conqwest2005" for a scavenger hunt and its website infringe and/or dilute ConQwest's allegedly "famous" mark CONQWEST for internet network security services. ConQwest makes these accusations against a promotional urban scavenger hunt-type game advertised on and operated via the internet and hosted in localities in the western United States, including in Denver, where ConQwest transacts no business.[10]

---

[9] ConQwest's mark is for "designing of internet security systems composed of software and hardware for others; installation of internet security systems composed of software; technical support services, troubleshooting of internet security system, composed of software and hardware, in class 42." *See* Ex. G (U.S. Trademark Registration No. 2,939,026 for CONQWEST). The description of the mark expressly requires that the letter "Q" be larger and overlapping the "n" and the "w" and that the letter "Q" is royal blue, while the other letters are black.

[10] This case was filed in the District of Massachusetts precisely because ConQwest stated that it "does not sell any goods or services in the State of Colorado, has no customers in the State of

Thus, the issue at the heart of ConQwest's proposed counterclaims is whether ConQwest's trademark rights in the internet network security field are infringed or diluted by Qwest's operation of an urban scavenger hunt game that uses, among other technologies, the internet. These issues do not arise in the case as filed. The proposed amendment at this late stage of the case, in violation of the Court's scheduling order, is clearly prejudicial to Qwest's ability to defend against these new charges.

For the foregoing reasons, Qwest requests that this Court deny ConQwest's motion to file an amended answer and counterclaims.

Dated. February 7, 2006               /s/ Heidi E. Harvey
                                      Heidi E. Harvey (BBO 548114)
                                      Thomas A. Brown (BBO #657715)
                                      FISH & RICHARDSON P.C.
                                      225 Franklin Street
                                      Boston, MA 02110-2804
                                      Tel. (617) 542-5070
                                      Fax. (617) 542-8906
                                      Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this seventh day of February, 2006.

                                      /s/ Heidi E. Harvey
                                      Heidi E. Harvey

Document in ProLaw

---

Colorado, has never purposefully directed its activities toward Colorado and lacks the most basic minimum contacts with Colorado." (Ex. H, ¶ 2.)