UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

QWEST COMMUNICATIONS
INTERNATIONAL, INC.,

                    Plaintiff,

        v.                                        Civil Action No. 04-cv-11878 RCL

CONQWEST, INC.,

                    Defendant.

---

## ANSWERS TO DEFENDANT CONQWEST, INC.'S INTERROGATORIES TO PLAINTIFF QUEST COMMUNICATIONS INTERNATIONAL, INC.

Plaintiff Qwest Communications International, Inc.( "Qwest"), for its objections and response to Defendant ConQwest, Inc.'s ("ConQwest") Interrogatories states as follows:

### GENERAL OBJECTIONS

1. Parties' Agreement Regarding Discovery

Continuously from March 2005 to December 2005, the parties to the action stayed discovery activities in favor of the mediation effort that was ongoing. The parties understanding was that, if the mediation was not successful, the parties would be given a reasonable time to respond in substance to outstanding discovery, i.e., the informal stay for mediation was not to be used a weapon to cut off the other party's right to object or ability to respond. See Plaintiff Qwest's Opposition to Defendant's Motion to Compel Responses to Requests for Production filed January 26, 2006 (Docket No. 35).

On January 19, 2006, the parties mutually agreed to withdraw from mediation and also mutually agreed to extend the period of fact discovery through February 28, 2006, subject to Court approval, which approval was later granted. Because the agreement to stay discovery was not meant to give either party the arbitrary ability to arbitrarily terminate and allege default of discovery obligations, it is plaintiff's position that neither party could be alleged to be in default

of discovery obligations until a reasonable amount of time after the mutual agreement to

withdraw from mediation and a good faith discovery conference as required by the local rules.

By letter of January 31, 2006, plaintiff Qwest, through counsel, initiated a L.R. 7.1

discovery conference and agreed to provide initial responses and objections to defendant

ConQwest's Interrogatories by January 30, 2006. In a discovery conference held between

counsel on February 2, 2006, defendant's counsel did not raise any issue or objection with

respect to plaintiff's offer regarding interrogatories. Indeed, the subject of interrogatories was

not discussed. Exhibit A.

On February 3, 2006, defendant ConQwest filed a document styled "Application of Writ

for Final Judgment," purporting to seek dismissal of the case for failure of plaintiff to respond to

interrogatories. The certificate of conference refers to two demand letters written by defendant's

counsel, but fails to comply with L.R. 7.1 regarding conferences of counsel.

2. <u>Definitions Inconsistent with Local Rules</u>

Qwest objects to definitions 3, 4, and 5 ("communication," "identify/identification" and

"document") as inconsistent with the Uniform Definitions set forth in Local Rule 26.5(C). In

particular, plaintiff objects to the definition of "identify" with respect to persons insofar as it

purports to require plaintiff to identify the person's social security number, date of birth, and

telephone number, which constitute personal information that has no relevance to this action.

Qwest objects to definition 6 ("marketing") as merely duplicative of the definition of

"document" and/or "communication" with respect to Plaintiff's services and overbroad relative

to the issues in dispute to the extent it seeks information unrelated to Qwest's promotion and

advertising of its goods and services.

Qwest objects to definition 7 ("dispute") to the extent it refers to "patent" claims of

which there are none.

3. Qwest objects to each of the Interrogatories to the extent that they seek testimony

protected from disclosure by the attorney-client privilege, work product protection, and/or any

other applicable privilege or immunity. Any disclosure that Qwest makes of such information is inadvertent and shall not constitute a waiver of the applicable privilege or immunity.

4. In view of the registration of the CONQWEST mark, Qwest will not further rely upon its claims for dilution in Counts III and V in this matter. Qwest reserves the right, in the future, to make claims for dilution if and when the CONQWEST registration is cancelled. As a result, the entire scope of goods and services offered by QWEST under the QWEST family of marks is no longer relevant to the case.

5. In the responses, the "relevant goods and services" with respect to QWEST's claims for trademark infringement and false designation of original are as alleged in paragraph 9 of the Complaint. The "relevant time period" is approximately October 1997, the date of acquisition by Qwest of Super Net, Inc. to present.

6. Qwest does seek monetary damages from defendant by way of its actual damage or defendant's profits in this action. Qwest seeks permanent injunctive relief and, if appropriate at the conclusion of the case, costs and attorneys' fees. Qwest therefore objects to each Deposition Topic to the extent it calls for information relating only to Qwest's monetary damages.

7. Qwest objects to the interrogatories to the extent they seek confidential financial, business, technical or other internal information of Qwest that is not generally known to the public. The parties have conducted themselves throughout this litigation as bound by the terms of a protective order (See Docket No. 9, Confidentiality Stipulation and Protective Order signed by counsel for the parties, dated February 11, 2005), even though the protective order had not been formally entered by the Court.

However, on February 3, 2006, in contravention of the prior agreement between counsel, the course of dealing in the case, and plaintiff's reliance on defendant's assurance that the agreement was binding as between the parties, the defendant's counsel suddenly announced that she "no longer felt bound by" the prior agreement between the parties concerning confidential information. Plaintiff immediately moved for a temporary restraining order enforcing the agreement and seeking entry of the protective order. See Docket No. 38.

3

Until such time as the Court resolves this issue, Plaintiff Qwest will not produce or disclose any further confidential information in response to these requests.

10. Qwest objects to each Request as overly broad and unduly burdensome to the extent it calls for "any and all documents." Qwest is a large company with vast, decentralized records. Such a requirement would impose extraordinary burden on Qwest. Instead, Qwest interprets each request that calls for "any and all documents" instead as calling for documents sufficient to show the requested information.

11. Qwest has conducted a diligent search and has made reasonable inquiry in an effort to comply with Plaintiff's Interrogatories, and its responses are made in a good faith effort to supply responsive, non-privileged information of which Qwest is presently aware. Because discovery in this matter is ongoing, Qwest reserves the right to supplement its Interrogatory Responses with additional information if and when it becomes known.

## GENERAL RESPONSES

The General Objections are incorporated by reference and will not be repeated with respect to each response.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Please identify the name(s), address(es), current business address(es), current position or title and length of time employed of the person(s), identify any and all individuals with whom you conferred, or documents you consulted, in responding to these interrogatories on behalf of the Plaintiff including interrogatory numbers which they contribute to.

### OBJECTION TO INTERROGATORY NO. 1:

See General Objection No. 2. The personal addresses of various witnesses with knowledge are not relevant and will not be disclosed.

4

Plaintiff objects to the request to the extent it calls for communications by and between counsel on the grounds that such communications are protected from discovery by the work product immunity and attorney-client privilege.

### RESPONSE TO INTERROGATORY NO. 1:

Plaintiff Qwest also consulted Eric Nowak, Adam Rennert, Don DeRisi, and Kelly Moravec, each of whom was previously identified as a witness with knowledge in Plaintiff's First Supplemental Initial Disclosure filed January 17, 2006.

Plaintiff Qwest further consulted:

Christie Searls, Esq., Corporate Counsel, Qwest Communications International, Inc., 1801 California Street, Denver, CO, 80202; employed since February 2001.

Doug Kerry, Senior Sales Engineer, Qwest Services Corporation, 950 17th, Suite 200, Denver, CO 80202-0000.

### INTERROGATORY NO. 2:

Please identify the name(s) and address(es) or current whereabouts of every person either known to you or believed by you to have knowledge of any matter relevant to the subject matter of this action, including but not limited to the design, implementation, marketing, distribution, management of the services provided by Plaintiff which Plaintiff identified as being overlapping (or refer to the Plaintiff) that are the subject of this matter.

### OBJECTION TO INTERROGATORY NO. 2:

Qwest incorporates the General Objection to the definition of " marketing." Qwest further objects to the interrogatory as vague and duplicative of other more specifically worded interrogatories where it seeks identification of persons with knowledge of "any matter relevant to the subject matter of the action."

### RESPONSE TO INTERROGATORY NO. 2:

Qwest has identified persons with knowledge of the relevant subject matter in Plaintiff's Initial Disclosures served on December 14, 2004, and Plaintiff's First Supplemental Initial Rule 26 Disclosures served on January 17, 2006.

Pursuant to Fed.R.Civ.P. 33(c), other individuals who may have knowledge of the issues in the case are identified in documents being produced by Qwest in response to the defendant's Requests for Production.

See also response to Interrogatory No. 1.

**INTERROGATORY NO. 3**:

Please describe in detail all of the communications services offered by Qwest as described in Paragraphs 9, 11, 12 and 13 of the Complaint, including but not limited to dates first offered by Qwest, the regions offered in, the customers, and the amount of annual revenue for each service.

**OBJECTION TO INTERROGATORY NO. 3**:

On the basis of General Objection No. 4, Qwest objects to the interrogatory to the extent that it seeks identification of telecommunications services offered under the QWEST family of marks earlier alleged for purposes of Qwest's dilution claims.

Qwest further objects to the interrogatory on the grounds of relevance to the extent that it seeks identification of goods and services other than those offered in connection with the QWEST or Q trademarks or variants thereof.

Qwest objects to the request to the extent is calls for disclosure of annual revenue beyond the public disclosures required to be disclosed by the Securities and Exchange Commission as not likely to lead to the discovery of admissible evidence. To the extent of any relevant scope of the request, Qwest further objects in view of defendant's renunciation of the agreed terms of the Confidentiality Stipulation and Protective Order. Qwest will respond to any relevant scope of this interrogatory as to relevant goods and services at such time as a Protective Order is entered and with information as kept in the ordinary course of Qwest's business.

**RESPONSE TO INTERROGATORY NO. 3**:

Qwest offers a variety of communications and communications-related services, including voice and data transmission in a number of forms, including ATM, Frame Relay, VPN, Intrusion Detection, and has done so since at least as early as January 1998. Qwest offered Voice

6

over IP (Internet Protocol) in 125 cities in 29 states by the end of 1998. See Qwest Press Release

dated September 14, 1998, produced as document QCI-0013462-66.

As set forth in a registration statement filed with the Securities and Exchange

Commission, as of April 2002, Qwest was offering telephone communication services in a 14-

state area of the central and western United States. Qwest had 29 million customers for such

services as of the date of filing the registration statement. Qwest's revenues from such services

where $2,419,000,000 in 1998, the last full year (year ended 12/31/1999) prior to the

incorporation of defendant ConQwest. Qwest had in excess of 190,000 miles of installed fiber-

optic cable over which it provided the above services.

A description of Qwest's business with respect to the above services can be found in the

registration statement filed by Qwest with the SEC on April 9, 2002, and is available through the

Security and Exchange Commissions EDGAR site as follows:

http://www.sec.gov/Archives/edgar/data/1037949/000091205702014283/0000912057-02-

014283-index.htm . Pursuant to Fed.R.Civ.P. 33(c), Qwest incorporates the documents and

information relating to Qwest's business on the EDGAR site, and which are publicly viewable

and downloadable without charge and therefore as accessible to defendant as they are to plaintiff.

However, to the extent that Qwest intends to affirmatively rely upon SEC filings other than the

registration statement identified above, Qwest will supplement this response.

Qwest offers electronic mail services, including management of electronic mail of

electronic mail messages, in connection with the mark QWEST and has done so since at least as

early as January 1998.

In December 1998, Qwest acquired ICON CMT, a New Jersey based Internet solutions

company headquartered in Weehawken, NY, with web hosting centers in New Jersey and San

Francisco. ICON CMT had revenues in 1997 of approximately $52 million and was a leader in

providing Internet solutions to information intensive clients such as Bear Stearns, Merrill Lynch,

CBS, Swissotel and Pfizer.

The acquisition of ICON CMT supported Qwest's development of broadband multimedia services, including providing virtual private network services for voice, data, and multimedia applications. The company announced in September 1998 that it had or planned to have customer Cyber Centers for customer hosted applications opened in Los Angeles, San Francisco, New and Washington D.C. by the end of 1998.

Qwest's offering of goods and services is further evidence by numerous federal trademark registrations and applications for the mark QWEST and variants thereof owned by plaintiff Qwest for the above services, including United States Trademark Registration No. 1,966,694, and United States Trademark Registration No. 2,210,992 (stylized), which is incontestable. As such, United States Trademark Registration No. 2,210,992, gives plaintiff Qwest the conclusive right to use the mark QWEST (stylized) in the United States, is conclusive evidence of Qwest's ownership of the mark and the validity of the mark for the goods, all for use in connection with the goods and services described in the registration.

Qwest owns United States Trademark Registration No. 2,727,556, filed on March 24, 2000, for "Computer software, namely, electronic mail software for sending, receiving, and managing electronic mail messages," which registered on June 17, 2003. By virtue of its registration and filing date of March 24, 2000, the registration confers on Qwest the exclusive right to use the mark QWEST in connection with email services throughout the United States as of the date of filing, March 24, 2000.

Qwest offered VPN services in the Commonwealth at least as early as March 2, 1999. See document produced as QCI 001389. In or before April 1999, Qwest offered VPN services to customers in Arizona, California, Florida, Georgia, Massachusetts, Nebraska, New Jersey, New York, Tennessee, Virginia, and Washington. Pursuant to Fed.R.Civ.P. 33 (c), Qwest incorporates by reference documents produced as QCI-001329, 1389, 1855, 1889, 2090, 2238, 2411, 2429, 2457, 2942, 3018, 3206, 3369, 3408, 3410, 3414, 3488, 3642, 3802, 4447, 4454, 4582, 4747, 4923, 5322, 5746, 5824, 6114, 6136- 6139, 6244, 6250, 6473, 6498-6531, and 6866 further evidence Qwest's VPN offerings in the United States as of 1999.

8

For other Qwest offerings of related services in the United States, including intrusion detection, managed firewalls, and encryption see documents produced as QCI-1268, 1247, 1249, 2739, 3038, 3536, 3994, 3578-3581, 3591-3607, 6866, 7240, 7245, 7481-7505, 7720-7725, 7821-7833, 7900-7904, 7943, 8068-8073,8168, 8184, 8871, 8880, 8884-8885, and 13459-13461.

Prior to April 1999, a company called LeaseTec Systems, Needham Heights, MA sold network security equipment and software to Qwest for resale by Qwest to Qwest's customers. See QCI -3051-3052.

**INTERROGATORY NO. 4**:

Please describe in detail the advertising and marketing campaigns undertaken by Qwest as described in Paragraphs 20 and 21 of the Complaint.

**OBJECTION TO INTERROGATORY NO. 4:**

Qwest objects to Interrogatory No. 4 on the grounds sets forth in the General Objections.

**RESPONSE TO INTERROGATORY NO. 4**:

Subject to the objection, Qwest will identify documents pursuant to Fed.R.Civ.P. 33(c) being produced by Qwest that constitute marketing materials for the goods and services identified in Response to Interrogatory No. 3.  See also response to Interrogatory No. 3.

**INTERROGATORY NO. 5**:

Please identify any and all documents regarding products or services offered by Plaintiff that currently we use or have used the "Q" or "Qwest" trademark, the date the trademark(s) were first used on such product(s) or service(s), and the markets in which the trademarks were first used on such product(s) and service(s).

**OBJECTION TO INTERROGATORY NO. 5:**

Qwest objects to Interrogatory No. 4 on the grounds sets forth in General Objections. Qwest further objects to the interrogatory on the grounds of relevance to the extent that it seeks identification of documents relating to goods and services other than those identified in response to Interrogatory No. 3.

9

**RESPONSE TO INTERROGATORY NO. 5**:

See Response to Interrogatory No. 3.

**INTERROGATORY NO. 6**:

Please describe in detail how the Defendant's use of "CONQWEST" dilutes the "famous" Qwest marks as alleged in Paragraph 30 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 6**:

See General Objection No. 4. Because Qwest no longer so contends in this action, no response is necessary.

**INTERROGATORY NO. 7**:

Please describe in detail how the defendant's use of "CONQUEST" [sic?] is confusingly similar to the Qwest marks as alleged in Paragraph 31 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 7**:

With respect to the mark itself, its appearance, connotation, and presentation, the mark QWEST is a coined term that did not previously exist in the English language before its adoption by Qwest's predecessors in interest. Because the mark begins with the letter Q, making it one of the rarest of terms in English, and because it violates the rule of English language spelling that the letter Q is invariably followed by the letter U, the mark is highly fanciful, distinctive, and memorable.

The adoption by defendant of a mark consisting of the term CONQWEST, which incorporates the coined mark QWEST conveys a strong association between the goods and services offered under the mark CONQWEST and plaintiff QWEST.

The prefix "con-" in English means, according to dictionary.com "together, with, joint, jointly commingle." As such, the prefix does nothing to distinguish the goods and services of defendant from those of plaintiff and, indeed, strengthens, based upon its connotation, the association between the defendant's goods and services and those of plaintiff.

10

In its trademark registration, defendant intentionally and prominently emphasized the letter "Q" by making it larger than the other letters and overlapping and by not capitalizing the initial letter "c" of the mark.

Because of the fact that capitalized letters are used only at the beginning of words and proper names in English and because English readers read left to right, the presentation of the mark with a capital Q in the middle of the word has the effect of making the reader start with the letter Q and seeing and understanding the mark as "Qwest."

The parties' presentations of their marks, that is the appearance of the marks to customers as used on goods and services in commerce is highly similar. Qwest's mark as presented on Qwest's main web site with the distinctive lightwave 'Q' in a light blue color scheme is shown below (www.qwest.com) :



Defendant's presentation of its mark with a large blue 'Q' from the first web page located in October 1999 (more than one year after Qwest's acquisition of ICON CMT) through February 2004 created further similarities between defendant's mark and plaintiff's mark QWEST as presented as can be plainly seen from this archived version of ConQwest's website http://web.archive.org/web/20021002214705/conqwest.com/default.asp :



ConQwest used the blue color scheme through at least February 2005, according to archived web pages. During the pendency of this action and, upon information and belief, in response to it, ConQwest changed its color scheme on its website from blue to red, but continues to use a large Q in the middle of the word. However, the trademark application that ConQwest filed expressly refers to the "Q" as "royal blue." Since ConQwest has apparently changed its presentation of the mark, it is no longer using the registration that it obtained and therefore is not entitled to rely upon any of the alleged benefits conferred by such registration.

12

With respect to the goods and services offered, they are substantially identical. Both Qwest and defendant ConQwest offer security services such as virtual private networks.

Qwest had identified the services it offers in Response to Interrogatory No. 3 above and has stated that is offered, e.g., Virtual Private Network services and e-mail messaging and management at least as early as 1998.

Defendant ConQwest's earliest known web page (more than one year later in October 1999) states as follows  http://web.archive.org/web/19991013050514/http://conqwest.com :

CONQWEST has demonstrated a core competency in the following general application areas:

**Intra/Internet Security Services** - providing all aspects of Internet security including the development and implementation of security policies, firewall installation, email content management, network and email anti-virus, URL filtering, services and security policy evaluation.

**E-mail Application Servers** - extending the functionality of the e-mail and web server by creating e-mail applications that automate business processes and manage interactions. E-mail Application Server is a companion to the web and e-mail servers, and it interfaces with existing company databases, directories and various other enterprise IT systems.

**CONQWEST Engineering** - the sophisticated software/database developer group which builds custom business applications and develops horizontal applications such as messaging and directory services. We specialize in Exchange from Microsoft and Sequel Server.

With respect to e-mail service and e-mail management, ConQwest expressly abandoned with prejudice its application to register E-MINDER ELECTRONIC POLICY MANAGEMENT BY CONQWEST in view of Qwest's Notice of Opposition (TTAB Proceeding commenced December 12, 2002) and the prior trademark rights identified by Qwest in its Notice of Opposition. Because ConQwest's mark was abandoned with prejudice, ConQwest is precluded from asserting priority of trademark rights relating to any of the goods and services identified in the abandoned registration.

**INTERROGATORY NO. 8**:

Please describe in detail how the defendant's use of "CONQWEST" is similar in either "sound," "appearance" and "meaning" to the Qwest marks as alleged in Paragraph 32 of the Complaint, including a factual basis for each such allegation.

**RESPONSE TO INTERROGATORY NO. 8**:

See Response to Interrogatory No. 7.

13

**INTERROGATORY NO. 9**:

Please describe in detail how the goods and services provided by the Defendant are either "identical" or "highly related" to the Qwest Goods and Services as alleged in Paragraph 33 of the Complaint, including a detailed description of the markets in which Qwest's Goods and Services were first offered, the dates on which Qwest's Goods and Services were first offered, and the customers whom purchased such Goods and Services that are "identical" or "highly related" to the goods and services provided by the Defendant.

**RESPONSE TO INTERROGATORY NO. 9**:

See Response to Interrogatory Nos. 3 and 7.

**INTERROGATORY NO. 10**:

Please identify the date(s) on which Qwest claims to have started offering Goods and Services as described in Paragraphs 9, 11, 12 and 13 of the Complaint, the specific Goods and Services offered, and the markets in which Qwest ceased offering the Goods and Services.

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 10**:

See Objection and Response to Interrogatory No. 3.

**INTERROGATORY NO. 11**:

Please describe in detail how the Defendant's Trademark Application Serial Number 76/050,931 for the mark "CONQWEST" is likely to cause confusion, deception and/or mistake in the relevant marketplace, industry and all channels of trade for Qwest as alleged in Paragraph 45 of the Complaint, including a showing of specific evidence of customer confusion or mistake.

**OBJECTION TO INTERROGATORY NO. 11**:

To the extent that this Interrogatory seeks Qwest's contention on why consumers for each parties' respective goods and services would view the marks and the goods and the channels of trade as similar, see Objection and Response to Interrogatory No. 7.

14

**INTERROGATORY NO. 12**:

Please describe in detail how the Defendant's Trademark Application Serial Number 76/050,931 for the mark "CONQWEST" is likely to cause dilution of the Qwest marks as alleged in Paragraph 46 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 12**:

See General Objection No. 4. Because Qwest no longer so contends in this action, no response is necessary.

**INTERROGATORY NO. 13**:

Please describe in detail how the Defendant's use of "CONQWEST" has and will continue to tarnish the Qwest marks as alleged in Paragraph 61 of the Complaint.

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 13**:

See Objection and Response to Interrogatories Nos. 7 and 11.

**INTERROGATORY NO. 14**:

Please describe in detail how the Defendant's use of "CONQWEST" has diminished the "uniqueness and individuality" of the Qwest marks as alleged in Paragraph 69 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 14**:

See Objections and Responses to Interrogatories Nos. 7 and 11.

**INTERROGATORY NO. 15**:

Please identify the date(s) on which and the regions in which Qwest began offering the services described in Paragraph 9 of the Complaint, including but not limited to managed security services, virus protection services, network intrusion detection services, virtual private network (VPN) services, e-policy management services, network management services, and the design of data and information networks.

**RESPONSE TO INTERROGATORY NO. 15**:

See Response to Interrogatory No. 3.

**INTERROGATORY NO. 16**:

Please identify the name(s) and address(es) of all of Qwest's predecessors-in-interest as described in Paragraph 19 of the Complaint.

**OBJECTION TO INTERROGATORY NO. 16:**

On the basis of General Objection No. 4, Qwest objects to the interrogatory to the extent that it seeks identification of predecessors in interest for telecommunications services alleged for purposes of Qwest's dilution claims. Qwest further objects to the Interrogatory in that Qwest's predecessors in interest all pre-date the incorporation of defendant ConQwest, Inc. in this matter and any business that it is doing or purports to have been doing in commerce in the United States, and therefore the information is unduly burdensome relative to its relevance to the action.

**INTERROGATORY NO. 17**:

Please identify the goods and services that Qwest offers that are alleged to be the "same" as goods and services offered by the Defendant as alleged in Paragraph 25 of the Complaint and the dates on which Qwest began offering said goods and services.

**RESPONSE TO INTERROGATORY NO. 17:**

See Response to Interrogatories Nos. 3 and 7.

**INTERROGATORY NO. 18**:

Please list each and every witness you intend to call at trial, including name(s), address(es), telephone number(s), and if employed by the Plaintiff, the current business address(es), current position or title and length of time employed of the person(s) and substance of their expected testimony.

**OBJECTION TO INTERROGATORY NO. 18:**

Qwest has made no decision who to call at trial in this matter and reserves the right to call any person identified in any party's Rule 26(a) Disclosures, Responses to Discovery Requests, and/or documents produced. Qwest will identify its trial witnesses at the time and in the manner required by the Court's final pre-trial order.

**INTERROGATORY NO. 19**:

Please identify each person whom you have retained as an expert or expect to call as an expert witness at trial, state the subject matter on which the expert is expected to testify, and state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

**OBJECTION TO INTERROGATORY NO. 19**:

Qwest will identify experts and make disclosure of their testimony at the time and in the manner required by the Court's scheduling order.

**INTERROGATORY NO. 20**:

Please describe in detail the percentage of Qwest's total revenues annually and attributable to goods and services provided to business, residential consumers and intermediary business that redistribute Qwest's goods and services as described in Paragraph 7 of the Complaint on a product by product or service by service basis.

**OBJECTION TO INTERROGATORY NO. 20**:

Qwest objects to this Interrogatory on the grounds of vagueness and relevance. To the extent the Interrogatory seeks Qwest's annual revenues during a relevant time period for the goods and services which are the subject of the action, Qwest will respond when an appropriate Protective Order is entered and with product revenue information for relevant goods and services as kept in the ordinary course of business.

**INTERROGATORY NO. 21**:

Please identify each "intermediary" business that redistributes Qwest's goods and services, the regions in which each "intermediary" business distributes such goods and services, and the date on which each "intermediary" business began distributing said goods and services for Qwest as described in Paragraph 7 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 21**:

See Response to Interrogatory Nos. 3 and 7.

**INTERROGATORY NO. 22**:

Please describe in detail the reasons why Qwest filed an Opposition in the United States Trademark Trial and Appeal Board (TTAB) against the Defendant's Trademark Application Serial Number 75/858096 as described in Paragraph 38 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 22**:

Qwest opposed for the reasons stated in its Notice of Opposition. See also responses to Interrogatories Nos. 7 and 11.

**INTERROGATORY NO. 23**:

Please describe in detail how the acts of the Defendant are false designations of origin, false or misleading descriptions of fact, or false or misleading representations of fact which are likely to cause confusion, deception or mistake as described in Paragraph 55 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 23**:

See Responses to Interrogatories Nos. 7 and 11.

**INTERROGATORY NO. 24**:

Describe in detail how Defendant's use of "CONQWEST" will continue injure Qwest's reputation, goodwill, and continue to dilute Qwest's trademark as described in Paragraph 62 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 24**:

See Response to Interrogatories Nos. 7 and 11.

18

AS TO OBJECTIONS:

Heidi E. Harvey (BBO 548114)
Thomas A. Brown (BBO 657715)
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110-2804
Tel: (617) 542-5070
Fax: (617) 542-8906
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for defendant ConQwest by Federal Express, Priority Overnight Delivery, on February 3, 2006.

Heidi E. Harvey